**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **ERNESTO VALLE,** ) | |
| ) | |
| **Petitioner,** ) | |
| ) | |
| **vs.** ) | **Case No. 14 C 4264** |
| ) | |
| **KIM BUTLER, Warden,** ) | |
| **Menard Correctional Center,** ) | |
| ) | |
| **Respondent.** ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

MATTHEW F. KENNELLY, District Judge:

In August 2008, an Illinois jury convicted Ernesto Valle of first degree murder, and a judge imposed a prison sentence totaling forty-five years.  The Illinois Appellate Court affirmed Valle's conviction on direct appeal.  After the Illinois Supreme Court denied Valle's petition for leave to appeal, he filed a petition for post-conviction relief in the Circuit Court of Kane County, which that court denied.  The Illinois Appellate Court affirmed the circuit court's decision, and the Illinois Supreme Court denied Valle's petition for leave to appeal.

Valle has petitioned this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, asserting five claims.  Respondent Kim Butler, the warden of the prison where Valle is incarcerated, argues that four of Valle's claims are procedurally defaulted, and that the state courts' rulings on the fifth—a Fifth Amendment claim that his confession was involuntary—were not unreasonable applications of federal law.  For the following reasons, the Court denies Valle's petition.

**Background**

**A.     The interrogation of Valle**

The Court draws the following facts from the state court record, and from the

Court's independent review of video footage depicting Valle's interrogation by police.  A

state court's factual findings are presumed correct unless a habeas petitioner presents

clear and convincing evidence to rebut the presumption of correctness.  *See Schriro v.*

*Landrigan*, 550 U.S. 465, 473–74 (2007) (citing 28 U.S.C. § 2254(e)(1)); *McManus v.*

*Neal*, 779 F.3d 634, 649 (7th Cir. 2015).  After reviewing Valle's submissions and the

video recording of his interrogation, the Court finds that Valle has not satisfied that

burden, so the state court's factual findings are presumed to be accurate.

In the early morning hours of August 12, 2006, Jessie Lozano was shot and killed

while driving a friend's truck through the intersection of Kendall and Grove Streets in

Aurora, Illinois.  Less than twenty-four hours later, police seized Valle at his home and

brought him in for questioning in connection with Lozano's death.

Valle was taken to an interview room at about 3:00 a.m. on August 13, 2006.  He

was given a *Miranda* waiver, whose first line he read aloud before reading the waiver in

full and signing it.  Over the course of the next two hours, pairs of officers took turns

coming and going from the room, often yelling and using profane language while

suggesting that Valle's friends had given him up and that his guilt had already been

established.  On more than one occasion, officers alluded to the likelihood that by

denying that he committed the crime and received the blessing of the Latin Kings street

gang for doing so, Valle was insulting the gang and likely would incur their wrath.

Officers also told Valle that an admission that the shooting was an accident or a mistake

could help him to avoid a life sentence, and the officers discussed details of the crime with one another in hopes that Valle would acknowledge them, correct mistaken statements, or otherwise inculpate himself.

After two hours of intermittent interrogation, Valle was taken back to a cell, where he stayed for almost eighteen hours without the ability to communicate with family, friends, or an attorney. Valle was provided a bed, food, and water during this time, but he claims that he neither slept nor ate due to exhaustion and the stress he felt from being wrongly accused. Shortly after 10:00 p.m., detectives Jeffrey Parish and Robert Wallace of the Aurora Police Department and Agent Larissa Camacho of the Federal Bureau of Investigation resumed interrogating Valle. During this interrogation, Camacho told Valle numerous lies to induce a confession. She showed him a compact disc in a plastic case and told him it contained a recording, made by a federal informant wearing a wire at the Latin Kings party Valle had attended the night of Lozano's death, on which Valle bragged about the shooting. Camacho also said that Lozano was a federal informant himself, which, she repeatedly explained, meant that Valle would be prosecuted for a more serious federal crime unless he could convince the police he did not know he had targeted an FBI informant. All of this was untrue. Lozano had not been a federal informant, and the authorities had no recording of Valle.

Camacho told Valle that she already knew everything that had happened because his friends had already turned on him and she had listened to the allegedly incriminating recording. This, too, was untrue. Valle told the officers that the recording

must have captured him telling "a little bullshit lie . . . just trying . . . to be cool."[1]  Parish told Valle that this was one of his last chances to say that he had made a mistake, that nobody was going to believe him, and that he was "fucked."  Parish and Camacho explained that Valle had two choices.  One option was to "sit here and lie" by continuing to maintain his innocence and await trial, at which time Camacho and her informants would testify, the recording on the compact disc would be played for the jury, and Valle would be "fucked" because no jury would ever believe his story.  His other option, the officers said, was to "tell the truth" and admit that he "made a mistake."

Verging on tears, Valle asked, "So what you're trying to say that, if I say 'I did it,' it's going to be easy on me?  I'm fucked no matter what, right?  Like you said."  Parish responded:

> PARISH:  No, dude, what I'm saying is this, ok?  You've got an opportunity right now to explain yourself.  You're not going to have that same opportunity in court later on.  Do you feel what I'm saying here?  Ok.  If you explain yourself now, you know, maybe there's a legitimate reason why this happened. . . .  But can you understand—if you keep lying to us, and then you go into court and you try to explain yourself then, how's that going to look on you?  No one is going to believe you.

Valle offered to take a lie detector test, swearing to the officers that he had done nothing wrong.  Parish continued to push Valle to admit that he killed Lozano by mistake.

---

[1] In its decision on direct review, the Illinois Appellate Court provided a detailed account of what it saw when it reviewed video footage of Valle's interrogation.  For the sake of completeness, the Court reviewed this footage as well.  As the Court indicated above, the appellate court's summary is presumptively accurate, and Valle has not provided clear and convincing evidence to rebut that presumption.  Indeed, the Court's review of the footage confirms that the appellate court's summary is accurate.  But in order to fully describe the interrogation, the Court has transcribed portions of the video footage rather than relying solely on the appellate court's summary.  That is the source of this quote and the other quotes throughout the remainder of this section of this opinion.

PARISH:     You did this, man, you made a mistake.  Be a man and own
            up to it, and explain why you did it.  This is how it is, man, it
            is what it is.  We already know what happened.  You need to
            tell us why.  I mean, were you out to smoke this person
            because you found out he was an informant for the FBI?

Valle continued to vehemently deny that he was involved in any criminal activity.

Parish, then Camacho, then Wallace each pointed out what they viewed as

inconsistencies in Valle's story, and Wallace told Valle that their investigation had been

thorough and led directly to him.  About eighteen minutes into this interrogation, the

following exchange occurred:

WALLACE:    You have a couple choices. . . .  We can point you out and
            we can make you look like a cold-blooded murderer that
            went out and did a hit on a federal informant, we can paint
            you out to be the number one criminal in Aurora right now.
            Or we can paint you out as some kid who's eighteen years
            old, who's young and impressionable, somebody who's not
            real smart when it comes to being out there on the streets
            yet, hasn't really lived out in the streets too long, very
            impressionable, wants to fit in, alright, and wants to go out
            and impress his boys—

CAMACHO:    And made a mistake.

WALLACE:    —and goes out and does something stupid and shoots at the
            wrong person not knowing they're a federal informant, but
            just shooting somebody so you can earn your corona.  If you
            did that, if you made a mistake, alright, and you shot
            somebody not knowing they were a federal informant, you
            need to tell us because we can explain that and say, "Hey,
            he's an eighteen year old kid, he don't know any better." . . .
            Shit, you're barely an adult.  You're barely an adult.  But you
            know what?  We can go in a courtroom and say, "Hey, listen,
            this kid's eighteen years old.  He made a fucking mistake.
            He was out, might have been drinking, might have been
            boozing it up, might have been high, what have you, he's out
            with some of his buddies, he's acting tough, he did
            something stupid."  That's what we think had happened.
            Now, if you want us to paint it out like you put a hit out, you
            took out a federal informant, if you want us to go that route
            and you don't explain why this happened, and how this

happened, if you don't explain that to us, if you don't explain it, and just sit there and go, "I don't know what you're talking about," you're going to look like a complete chump when you go up on that stand. . . . You know what you've got to do right now? You've got to do something we call "damage control." Damage control is this: we already know what happened. We already know what happened. Here's a chance for you to show some remorse and say, "I fucked up. I screwed up, I did something stupid, by god-all means the last thing I planned on doing was going out that night and smoking some fucking federal informant." That's what you've got to say. Alright? I'm not putting words in your mouth, but I don't think you were intentionally going out there to shoot somebody like that. If you shot somebody, you're high, you're out there doing stupid shit, you're trying to impress your boys, and you killed this guy or what have you—shit happens. But if you go out there, smoke a federal informant, it's a whole different ballgame. Do you catch what I'm saying?

VALLE:      Yes, sir.

WALLACE:    Are you feeling me right now?

VALLE:      Yes, sir.

WALLACE:    Alright, so here's the scoop is, we're going to get past all this other crap, alright? Do you feel bad about sitting here right now?

VALLE:      Yes, sir.

WALLACE:    Alright, you feel pretty bad don't you? And you wouldn't be looking at me like that if you didn't. And it looks like you got something heavy on your chest right now you need to get off. I think you better start talking, and you better start making some sense, because I'm serious—none of this shit is adding up, the way you're talking. We've already talked to Hector, alright? We've already talked to him, and we've already talked to Chris. We haven't talked to you in a while, have we? We haven't talked to you since early this morning. Who do you think we've been talking to?

VALLE:      To other people.

WALLACE:    Exactly. We've already had the state's attorney down here

and had them talking to people too.  Why do you think we're coming to you last?  Think about it.  Because we have a case against you right now.  But here's the deal:  You have a chance to make this right for yourself, as good as you can right now, you have a chance to say, "Hey, you know what? I screwed up.  I'm a man, I screwed up."

VALLE:      I screwed up.  I screwed up.

WALLACE:    Alright.  Tell me how it happened.

VALLE:      I just went home, going home, and that's what happened.

WALLACE:    Tell me what happened.  You need to tell me what happened.  I need to hear it from you.  I need to hear your words.  I need to hear it in Ernie's words.  I need to hear it in Ernesto's words.

VALLE:      It was a mistake.  I thought it was someone else.  I pulled the trigger, and that's it.  And we went home after.

Valle then began answering questions about the night's events.  He described meeting his friends Hector Delgado and Chris Acevedo at a party at his house before going with them to a Latin Kings party.  The group stayed at the party for a while, and then Valle left the party as a passenger in Delgado's car with Delgado driving and Acevedo in the back seat.  Valle described grabbing from the back of the car a nine-millimeter Glock semiautomatic handgun with a chrome finish.  He made intimidating looks at the driver of a vehicle coming toward Delgado's car and then exited the car while Delgado drove around the block.  Valle claimed to have fired three shots at the vehicle without identifying the person inside or looking to see what happened to the driver before running to Delgado's car and driving away.  Valle initially denied returning to the party, but when Camacho challenged him on this, he agreed with her and said he did return to the party, shaking hands with a Latin Kings lieutenant and telling the lieutenant that he had "hit him up."

After a break in the interrogation, detectives asked Valle to repeat his story. Valle could not tell the detectives where the shooting took place, but he gave them a more precise timeline of events. He claimed that he, Acevedo, and Delgado left his house at about 9:30 or 10:00 p.m. and went to "Spooky Lou and Chauny's" house, where they stayed for about an hour before leaving in Delgado's car. Delgado told Valle there was a semiautomatic handgun behind the seat, which Valle took with him when he got out of the car. Delgado drove the car around the corner to wait. When Valle saw a car come toward him, he shot three times from a distance and then ran around the corner and got into Delgado's car. They drove to a party, where Valle said he saw Latin Kings lieutenant Enrique Torres and told him he had "hit someone up." Valle stayed at the party for less than thirty minutes, and then Delgado drove him home.

**B.     Trial court proceedings**

In October 2006, Valle was charged by indictment with two alternative counts of first degree murder. Valle moved to quash his arrest as unsupported by probable cause, but his trial counsel withdrew the motion before the court held a hearing. Valle also moved to suppress the inculpatory statements he made during the interrogation, arguing that a combination of factors made his statements involuntary. Specifically, Valle contended that his statements were involuntary because police engaged in coercion and deception to which he was particularly susceptible as a result of (1) the police depriving him of sufficient food, water, and sleep; (2) his consumption of several alcoholic beverages in the hours leading up to his arrest and interrogation; and (3) his personal intellectual limitations.

The trial court judge watched video of Valle's interrogations and determined that the prosecution had provided enough evidence to shift to Valle the burden to show his statements were made involuntarily. Valle testified that he was eighteen years old at the time of his arrest and interrogation. He testified that he had never been arrested, taken to a police station, or interrogated by police. He also testified that he had graduated from high school, but had been enrolled in special education classes throughout high school because he "had trouble understanding."

The trial judge denied Valle's motion to suppress. The judge found that the police and agent Camacho employed somewhat aggressive and deceptive tactics but that they did not induce an involuntary confession. The judge observed that the officers had suggested to Valle that admitting to the murder might lead him to receive a lighter sentence but determined that under Illinois law, a confession given under such circumstances is generally admissible unless coupled with the promise of some specific benefit. The trial judge also noted that Valle was articulate and responsive during both the interrogation and his testimony during the suppression hearings, belying his claims that he lacked the intellectual acumen to give a voluntary confession under the pressure of accusatorial and sometimes deceptive questioning. Finally, the judge determined that the interrogation was not excessively long and that the police did not err in choosing not to re-administer *Miranda* warnings after every break in interrogation. The judge also concluded that Valle was not deprived of his right to counsel; rather, he was informed of his rights, effectively waived them, and did not at any subsequent time attempt to affirmatively invoke them.

The case proceeded to trial by jury. The prosecution first called Armando Gallegos, Lozano's younger brother. He testified that on the night of Lozano's death, Lozano had been home with Armando and their other brother Andres, and a group had gathered at the house for a party to celebrate Andres's birthday. Armando said that Lozano had backed a friend's blue pickup truck out of the driveway so a guest whose car was blocked in could leave. When the guest did not come to move his vehicle, Lozano drove off in the pickup truck.

The prosecution then presented testimony from John Burch, who testified that sometime shortly before 3:00 a.m. on August 12, 2006, as he was preparing for his early shift at work, he heard five "very deep-sounding" gunshots and the squealing of tires. Fifteen to twenty seconds later, he opened his front door, peered outside, and saw a blue pickup truck slowly going in reverse down his street toward his house. The truck began to angle toward Burch's driveway, and when it neared the vehicles parked there, the glow of a streetlight revealed a hole in the driver's-side window and a person "slumped over" in the driver's seat. Burch ran to the truck and opened the driver's door. The driver was bloody and appeared badly wounded, but Burch felt a pulse when he touched the driver's neck. Burch asked his wife to call 911 for an ambulance. The driver's foot was apparently still on the gas pedal, so Burch reached over and shifted gears to put the truck in park. He then heard the driver gasp and knew "he was gone." Burch felt no pulse when he checked a second time. Burch testified on cross-examination that he saw no other vehicle and never saw an assailant, either in a vehicle or on foot.

Other prosecution witnesses provided additional details regarding the crime scene.  Sergeant James Boatman, a patrol officer, described arriving at Burch's property to find a blue pickup truck with a shattered driver's-side window.  The truck's driver was seated in the driver's seat with significant injuries and no pulse.  Peter Wullbrandt, another patrol officer, testified that he secured the crime scene with tape and kept a crime log, and that he had to adjust the crime scene tape upon discovering five .45 caliber shell casings in the middle of the intersection of Grove Street and Kendall Street.  Armando Montemayor, a police evidence technician, testified that five spent .45 caliber shell casings were discovered in the intersection of Grove and Kendall.  One was metallic gray and the other four were gold, but Montemayor testified that it was possible for one firearm to have discharged all five casings.

Dr. Bryan Mitchell, the forensic pathologist who conducted Lozano's autopsy, testified concerning Lozano's three gunshot wounds.  One bullet entered Lozano's head through his left temple, passing through his frontal and temporal lobes and exiting through the right temporal area of his skull.  Another entered between his jawline and the base of his neck on his left side, severing his spinal cord as it progressed from the front of his body toward the back, left to right, and downward.  Dr. Mitchell found the large caliber bullet that caused this injury lodged in Lozano's body.  A third bullet entered Lozano's body on the left side of his back near his waist and was also recovered from inside his body, deformed as a likely result of passing through something hard like a car door.  Dr. Mitchell testified that no gunpowder was found on Lozano's skin, so the shots were probably fired from a range of more than twenty-four inches.

The prosecution also introduced the testimony of Aurora police officer Jason Russell. Russell testified that in the early morning hours of August 13, 2006, he and approximately six other officers gathered at 509 Columbia Street to arrest Valle. Just after 1:00 a.m., Russell received a radio communication that another officer had observed a subject matching Valle's description running towards the back of the house. Russell and his partner then drove a block west and made their way to the rear of the house. Seeing movement through an upstairs window, Russell shined his flashlight at the window and saw someone peer out before ducking behind a wall. Another officer used the loudspeaker in his squad car to instruct the residents of the house to exit. Russell identified the first person exiting the house as Valle, who he also identified as the person he had seen peering out the window. Valle was not wearing Latin Kings colors when he came out of the house. Russell testified that up to that point, nobody had told Valle why he was being arrested or announced the reason for the arrest over the loudspeaker. Nonetheless, Russell stated that when police called out to direct Valle's brother to exit the house, Valle told the officers, "That's my brother. He's got nothing to do with this."

Russell also offered expert testimony concerning the structure and practices of the Latin Kings gang organization. The prosecution laid a foundation establishing that Russell had significant training and experience identifying and profiling gang activity and membership rites, and had studied the organizational structures of gangs including the Latin Kings. Defense counsel did not challenge Russell's qualifications to offer such testimony. Russell explained that non-members of the Latin Kings who associate with the gang are called "shorties," and that shorties become full-fledged members of the

gang (in gang parlance, they "get their crown") by shooting someone.  He further stated that the Latin Kings have a written manifesto that sets forth an organizational system and set of rules.  Under these rules, the gang's leader, the "Inca," decides who may be admitted into the gang.  Shorties may not know the identities of ranking members, but they may know the identities of "enforcers," the lieutenants who serve as liaisons between shorties and gang leadership.  If a shorty fails to follow an enforcer's orders, an enforcer might order a "violation," an act of physical brutality against the shorty, as punishment.  Russell testified that the Aurora police department keeps track of known gang members, associates, and other affiliates.  According to Russell, Lozano was known to the police department as a self-admitted gang member; Valle and Acevedo were classified as gang associates; Delgado was not classified; and Enrique Torres was classified as an enforcer.

The prosecution's case centered on Valle's confession and the testimony of Acevedo, who was not charged with any crime in connection with Lozano's death, and Delgado, who had already pleaded guilty to conspiracy to commit murder under an agreement to testify against Valle.  Acevedo testified that he, Valle, and Delgado left a party at Valle's house to go to a Latin Kings party, where Valle talked with Torres and was given a gun.  Feeling sick, Acevedo went to Delgado's car to sleep in the back seat. He awoke to the sound of gunshots and the sight of Valle running toward the car with a gun in his hand.  He stated that as Valle climbed into the car, he said, "'I got the nigga,' something like that."  The three returned to the party and Valle bragged about getting his crown.  The prosecution and the defense stipulated that Acevedo made substantially different statements prior to his testimony, at one point denying involvement entirely and

at another point claiming the shooting took place earlier in the evening, on the way from Valle's house to the Latin Kings party.

Delgado provided a similar account of events. He stated that on the night of the shooting, Delgado drove Valle and Acevedo from a party at Valle's house to a Latin Kings party on Coolidge Avenue, where he saw Torres talk with Valle and another person hand Valle a black semiautomatic handgun. Later, Valle told Delgado they should drive to another party to find women. Delgado drove and Valle sat in the passenger seat giving directions. They drove by a place where, based on the large number of cars going in and out of the driveway, it appeared to Delgado that a party was going on. Valle asked Delgado if he had seen "that truck" or "that SUV," and Delgado then started looking for a place to park. Valle instructed Delgado to pull over, and the two sat talking about women for a short while. Delgado saw the truck coming toward them and asked Valle if it was the truck they had seen before. Valle exited the car with the gun, ran toward the truck, and began shooting when he got to the intersection of Kendall and Grove. Delgado said he heard "three to five" or "four to five" rapidly fired shots, and he saw the muzzle flash out of the front of the gun. Acevedo then woke up in the backseat and Valle ran back to the car, saying that he "got him" and explaining that the truck's driver had been "snitching" on the Latin Kings. The group returned to the party, where Valle told Torres that he got him and Torres said they were shorties who had "come home." About thirty minutes later, Delgado took Valle home.

Delgado and Acevedo both admitted on cross examination that they gave prior accounts of the night that significantly differed from their testimony at trial. Defense counsel also presented testimony from Torres that contradicted Delgado's and

14

Acevedo's descriptions of the Latin Kings party: Torres claimed that the party had largely died down by the time Acevedo and Delgado claimed to have returned to the party. The defense then presented alibi witnesses who testified that Valle was asleep in his bed at the time of the shooting. Jose Salgado testified that he attended a get-together at the Valles' house on the night of the shooting. He claimed that at the time of the shooting, as he was being helped to bed at the Valles' house, he saw Valle lying in a bed. Salgado admitted that the reason he was being helped to bed was that he was so highly intoxicated that his friends would not let him go home. Ricardo, Valle's brother, testified that while helping Salgado at the time of the shooting, he also saw Valle at home in bed.

On August 29, 2008, the jury found Valle guilty of first degree murder and found that he discharged the firearm that was used to kill Lozano. Valle filed a post-trial motion challenging the circuit court's decision to admit his confession into evidence. The court denied the motion and sentenced Valle to a total of forty-five years imprisonment, including twenty years for first degree murder and a twenty-five year firearm enhancement.

## C.     Appeal and post-conviction proceedings

Valle appealed his conviction to the Illinois Appellate Court, arguing that his inculpatory statements to police were involuntary and should have been suppressed. The appellate court observed that the courts of some states have shown "a concern with empirical evidence of what police tactics make confessions unreliable. That concern [has] led those courts to place a much greater weight on the use of deception and implications of leniency than has any Illinois decision of which we are aware."

*People v. Valle*, 405 Ill. App. 3d 46, 61, 939 N.E.2d 10, 22 (2010). Because Valle had

failed to show any special susceptibility to the tactics the police had employed, the

appellate court held that the circuit court did not err in admitting Valle's statements.

Valle filed a petition for leave to appeal to the Illinois Supreme Court, arguing that

he was arrested without probable cause and that his confession was involuntary. This

petition was denied, and Valle did not petition the Supreme Court of the United States

for a writ of certiorari.

In April 2011, Valle filed *pro se* a post-conviction petition in the circuit court

pursuant to 725 ILCS 5/122–1. Valle argued that trial counsel was ineffective on five

grounds: (1) counsel's failure to argue "correctly" that Valle was arrested without a

warrant or probable cause; (2) counsel's failure to argue effectively that Delgado's deal

with the prosecution and the prosecution's decision not to charge Acevedo motivated

them to testify falsely; (3) counsel's failure to challenge the admission of Acevedo's prior

inconsistent statements under 725 ILCS 5/115–10.1 on the ground that Acevedo's

claimed loss of memory rendered him unavailable for cross-examination about his prior

statements; (4) counsel's failure to argue the insufficiency of the evidence; and (5)

counsel's failure to challenge officer Russell's allegedly incorrect identification of Valle at

the time of his arrest. Valle also argued that his appellate counsel had been ineffective

for "failure[] to file these issues" on direct appeal, and that his sentence was excessive.

*See* Post-Conviction Pet., dkt. no. 11-12, at 2.

The circuit court dismissed the petition as frivolous or patently without merit.

*People v. Valle*, No. 06 CF 2062, dkt. no. 11-13 (Ill. Cir. Ct. July 20, 2011). The court

first ruled that Valle had waived all claims for relief based on ineffective assistance of

trial counsel by failing to raise them on direct appeal.  The court then ruled that it was not unreasonable for appellate counsel not to raise these points on appeal.  The court concluded that trial counsel's choice to file a motion to quash Valle's arrest and then withdraw it indicated a strategic choice rather than a failure to render effective assistance, and because the underlying ineffective assistance of trial counsel claim was without merit, it was not error for appellate counsel to elect not to raise the issue.  The court similarly determined that Valle's other claims of ineffective assistance of trial counsel were without merit and thus appellate counsel's decision not to raise them on direct appeal did not prejudice Valle.

Valle appealed to the Illinois Appellate Court, asserting an ineffective assistance claim for his appellate counsel's failure to challenge sufficiency of the evidence on direct appeal.  The appellate court held that Valle had forfeited this claim and that he could not raise it on appeal because it was not presented in the initial post-conviction petition. *People v. Valle*, 2013 IL App (2d) 110756-U, 2013 WL 1798500.

Valle then filed a *pro se* petition for leave to appeal to the Illinois Supreme Court in which he argued five points.  First, he argued that admitting gang expert testimony rendered his trial unfair.  Second, he argued that the evidence was insufficient to support his conviction.  Third, he argued that trial counsel was ineffective for a variety of reasons, including counsel's choice not to pursue its motion to quash his arrest, failure to move to suppress certain statements by Delgado and Acevedo, and failure to challenge officer Russell's identification of Valle.  Fourth, he argued the prosecution relied on false testimony in order to secure a conviction.  Fifth, he argued appellate counsel was ineffective for failing to raise insufficiency or ineffective assistance of trial

counsel on direct appeal.  The Illinois Supreme Court denied Valle's petition.

**D.     Valle's habeas corpus petition**

Valle filed a timely petition for a writ of habeas corpus in June 2014.  He asserts

five claims for relief.  First, he argues that trial counsel was ineffective for failing to

pursue the motion to quash his arrest.  Second, Valle challenges his confession as

involuntarily given.  Third, he claims he was denied due process because the admission

of gang expert testimony made his trial unfair.  Fourth, he asserts that he was denied

due process because Delgado and Acevedo testified "pursuant to massive deals that

created an overwhelming incentive to lie."  Fifth, he claims that the evidence was

insufficient to support his conviction.

In response, respondent argues that four of Valle's claims are procedurally

defaulted and the fifth (the voluntariness of his confession) lacks merit.  In his reply

brief, Valle concedes that he "did not properly exhaust [four of his claims] because

although he attempted to raise [them], he did not pursue [them] through one complete

cycle of state court litigation as required by the AEDPA."  He argues, however, that

ineffective assistance of appellate counsel was the reason he failed to assert the claims

in state court, and that this ineffective assistance prejudiced him because a challenge to

his conviction on any of these grounds would have been successful.

**Discussion**

A petitioner is entitled to a writ of habeas corpus "only on the ground that he is in

custody in violation of the Constitution or laws or treaties of the United States."  28

U.S.C. § 2254(a).  A federal court may issue a writ of habeas corpus on a claim that

was adjudicated on the merits in state court proceedings only if the state court's

decision (1) was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Id.* § 2254(d); *see also Hanson v. Beth,* 738 F.3d 158, 162 (7th Cir. 2013). This is a "highly deferential standard for reviewing claims of legal error by the state courts." *Burt v. Titlow*, 134 S. Ct. 10, 15 (2013).

Additionally, a habeas corpus petitioner must "give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). This means a petitioner must have "invoked one complete round of the State's established appellate review process." *Id.* "In Illinois, which has a two-tiered appellate review system, a petitioner must present a claim at each level of the state court system, either on direct appeal or in post-conviction proceedings." *McDowell v. Lemke*, 737 F.3d 476, 482 (7th Cir. 2013). If a claim is procedurally defaulted, a federal court will not address its merits unless the petitioner can demonstrate both cause for and prejudice from the default or that a miscarriage of justice will occur if the court fails to address the merits. *See, e.g.*, *Woods v. Schwartz*, 589 F.3d 368, 373 (7th Cir. 2009).

A.   **Valle's claim of ineffective assistance of appellate counsel asserted as an excuse for procedural default of certain claims**

Respondent contends that all of Valle's claims to relief except for his voluntariness challenge are procedurally defaulted because Valle did not present them on direct appeal to the Illinois Appellate Court. Valle concedes that the claims were not presented on direct appeal but asks the Court to excuse the default on the ground that his appellate counsel rendered ineffective assistance by failing to assert the claims.

A claim of ineffective assistance of appellate counsel asserted as cause for procedural default itself may be procedurally defaulted if not properly raised in state court. *See Edwards v. Carpenter*, 529 U.S. 446, 451–53 (2000) (holding that ineffective assistance of counsel claims themselves must "be first raised in state court" and are not immune from procedural default); *Lee v. Davis*, 328 F.3d 896, 901 (7th Cir. 2003) (*Edwards* "established that the assertion of ineffective assistance as a cause to excuse a procedural default in a § 2254 petition is, itself, a constitutional claim that must have been raised before the state court or be procedurally defaulted."). Thus, in order for the Court to consider Valle's contention that he received ineffective assistance from his appellate counsel, Valle must first have raised the ineffective assistance claim in "one complete round of the State's established appellate review process." *O'Sullivan*, 526 U.S. at 845.

### 1.      Claim of trial counsel's failure to pursue motion to quash arrest

Valle argues that trial counsel rendered ineffective assistance by failing to pursue a motion to quash his arrest due to lack of probable cause. Valle concedes that he procedurally defaulted this claim by failing to assert it on direct appeal but contends that the default should be excused because his appellate counsel rendered ineffective assistance by failing to assert the claim. But although Valle asserted in his post-conviction petition that appellate counsel rendered ineffective assistance by failing to raise this issue, he abandoned that contention on appeal to the Illinois Appellate Court. Valle therefore procedurally defaulted the claim of ineffective assistance of appellate counsel that he asserts as cause for the default of his claim of ineffective assistance of trial counsel. The record provides no basis on which Valle's default of the claim of

ineffective assistance of appellate counsel may be excused. The Court therefore dismisses claim one.

### 2.    Claim regarding failure to challenge gang expert's testimony

In his third claim, Valle argues that the trial court should not have permitted officer Russell's expert testimony concerning the Latin Kings gang's organizational structure, leadership, and activities because the testimony was unfairly prejudicial. It is unclear from Valle's petition and reply whether he is arguing that trial counsel rendered ineffective assistance by failing to object to the expert testimony or that the trial court erred by not barring the testimony sua sponte. Regardless, Valle procedurally defaulted the claim because he did not raise it on direct appeal.

Valle contends that the procedural default was the result of his appellate counsel's ineffective assistance. But this ineffective assistance claim is procedurally defaulted as well. The only time Valle ever raised any issue related to Russell's testimony before an Illinois court was in his petition for leave to appeal to the Illinois Supreme Court following the appeal of the dismissal of his post-conviction petition. Because the record provides no basis on which Valle's procedural default of this claim may be excused, the Court dismisses claim three.

### 3.    Insufficiency of the evidence

The Illinois Appellate Court determined on Valle's post-conviction appeal that Valle forfeited any argument that he received ineffective assistance of appellate counsel by failing to assert it in his post-conviction petition. *See Valle*, 2013 IL App (2d) 110756-U ¶ 15, 2013 WL 1798500, at *3. In his post-conviction petition, Valle listed eight claims for relief, stating:

Petitioner's constitutional rights were violated by[:]

> 1) Counsel's failure to argue PROBABLE CAUSE "CORRECTLY" DENIED DEFENDANT OF A FAIR TRIAL.

> 2) Counsel's failure to argue motive to testify falsely denied defendant of a fair trial.

> 3) Counsel's failure to argue MOTION 115–10.1 denied defendant of a fair trial.

> 4) Counsel's failure to argue REASONABLE DOUBT denied defendant of a fair trial.

> 5) Counsel's failure to file a MOTION of LIMINIE [sic] denied defendant of a fair trial.

> 6) Counsel's failure to argue identification denied defendant of a fair trial.

> 7) Appellate counsel's failures to file these issues denied defendant of a fair trial.

> 8) Unconstitutional statute and violation of due process denied defendant of a fair trial.

Resp.'s Ex. L, dkt. no. 11-12, at 1–2.

After his petition was summarily dismissed, Valle appealed, but he did not pursue any of his claims pertaining to the ineffectiveness of trial counsel. He instead argued on appeal only that his petition should be interpreted as challenging appellate counsel's failure to raise sufficiency of the evidence on direct appeal, which the appellate court ruled his petition "cannot reasonably be read to say." *Valle*, 2013 IL App (2d) 110756-U ¶ 15, 2013 WL 1798500 at *3. Put differently, the appellate court found that on post-conviction appeal, Valle did not argue that his appellate counsel rendered ineffective assistance by failing to argue that trial counsel should have challenged sufficiency of the evidence or by failing to argue insufficiency of the evidence on direct appeal.

Respondent argues that Valle procedurally defaulted both claims.

The Court agrees that Valle has procedurally defaulted his claim that appellate counsel rendered ineffective assistance by failing to argue that trial counsel was ineffective for inadequately raising sufficiency of the evidence. When he appealed the denial of his post-conviction petition, Valle abandoned his argument that appellate counsel was ineffective for failing to raise trial counsel's ineffective assistance, and thus he defaulted that aspect of his ineffective assistance claim. Rather, Valle focused on his contention that appellate counsel should have argued insufficiency on appeal.

The Illinois Appellate Court concluded that Valle's post-conviction petition did not include a claim of ineffective assistance of appellate counsel for failure to challenge the sufficiency of the evidence. *Id.* The Court is not so sure. Courts are required to liberally construe the filings of *pro se* litigants. In his *pro se* petition for post-conviction relief, Valle argued that his trial counsel failed him by not arguing reasonable doubt. The logical reading of this is that Valle was arguing that his trial counsel should have challenged his conviction based on insufficiency of the evidence. Valle then argued that appellate counsel rendered ineffective assistance by failing to raise "these issues" on appeal. The appellate court determined that by "these issues," Valle could only have meant his ineffective assistance of trial counsel claims. But the logical reading of Valle's reference to "these issues" is that it included the issues he believed his trial counsel should have argued, including sufficiency of the evidence. Read this way, Valle's petition for post-conviction relief included a claim of ineffective assistance of appellate counsel for failure to argue sufficiency of the evidence. He included the claim again in his petition for review before the Illinois Supreme Court, which was ultimately denied.

For these reasons, the Court concludes that Valle did not procedurally default his claim that his appellate counsel rendered ineffective assistance by failing to challenge the sufficiency of the evidence on direct appeal. This contention is therefore available as a potential excuse for Valle's procedural default of his sufficiency-based claims in his federal habeas corpus petition.

To establish an ineffective assistance of counsel claim, a petitioner must show both deficient performance and prejudice. *Strickland v. Washington,* 466 U.S. 668, 687 (1984). Deficient performance is that which falls below "an objective standard of reasonableness," considered "under prevailing professional norms." *Id.* at 688. Courts must be "highly deferential" when scrutinizing counsel's performance, which is subject to a "strong presumption" that it "falls within the wide range of reasonable professional assistance." *Id.* at 689. As for prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

There is not a reasonable probability that the outcome of Valle's appeal would have been different had appellate counsel squarely argued the insufficiency of the evidence. In light of Valle's confession and the eyewitness testimony given by Acevedo and Delgado, the evidence presented at trial was sufficient for a reasonable jury to find Valle guilty of the crime charged. Acevedo and Delgado may have had some incentive to lie, but neither was so unbelievable as to render his testimony not credible as a matter of law. *See United States v. Thomas*, 286 F. App'x 932, 933 (7th Cir. 2008) (citing *United States v. Griffin*, 493 F.3d 856, 863 (7th Cir. 2007) and *Hayes v. Battaglia*,

403 F.3d 935, 938 (7th Cir. 2005)).  Acevedo's and Delgado's accounts of the night in question also did not differ from one another so drastically as to render it impossible that a rational trier of fact "could find the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  In sum, Valle was not prejudiced by his appellate counsel's failure to raise sufficiency of the evidence on direct appeal.

As a result, Valle has not shown cause and prejudice sufficient to overcome the procedural default of his claims that he was deprived of his right to a fair trial due to the state's main witnesses having an incentive to lie (claim 4) and the prosecution failing to prove its case beyond a reasonable doubt (claim 5).  The Court therefore dismisses Valle's fourth and fifth claims.

**B.      Voluntariness of confession**

In his second claim, Valle maintains that the trial court's admission of his confession violated his Fifth Amendment rights because the confession was not voluntary.  He argues that the inculpatory statements he gave to the Aurora police and FBI agent Camacho were given involuntarily as a result of the combined effects of his interrogators' deceptive and aggressive tactics, the conditions under which he was confined and interrogated, his physical and mental state at the time of his interrogation, and a number of personal characteristics including his age, intellect, and experience with the legal system.  Respondent acknowledges that Valle did not procedurally default this claim but contends that it lacks merit.

The Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254, dictates the standard by which the Court reviews this claim for relief.  Under section

2254(b), a court may not grant a writ of habeas corpus "with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. §2254(d).  A state court's decision is contrary to the Supreme Court's clearly established precedent "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of [the Supreme Court] but reaches a different result."  *Brown v. Payton*, 544 U.S. 133, 141 (2005) (citations and quotation marks omitted).

"An unreasonable application of clearly established federal law occurs when the state court correctly identifies the governing legal principle from Supreme Court decisions but unreasonably applies it to the facts of the particular case."  *McManus v. Neal*, 779 F.3d 634, 649 (7th Cir. 2015) (internal quotation marks omitted).  This objective reasonableness standard "exceeds even the clear-error standard of review." *Id.* (citing *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014)).  As stated at the outset of this opinion, state courts' findings of fact also enjoy a presumption of correctness that may only be overcome by clear and convincing evidence.  *See* 28 U.S.C. § 2254(e)(1).

Valle moved to suppress the statements he made during his interrogation based on the claim that they were involuntarily given.  He claimed that he had been deprived sufficient food, water, and sleep, and that his high susceptibility to deceptive police tactics due to his personal intellectual limitations led him to be coerced into falsely confessing.  The trial court denied Valle's motion.  As the appellate court later

26

summarized:

> It found that the officers did not falsely suggest sympathy. It recognized
> that the tone of the interviews sometimes became accusatorial and that
> the officers "slid their chairs into defendant's space" and shook a finger at
> defendant. It noted that Camacho had engaged in deception. The court
> accepted the validity of the *Miranda* warnings. It found that defendant had
> been articulate and responsive in his answers throughout the
> interrogation.

*Valle*, 405 Ill. App. 3d at 53, 939 N.E.2d at 16.

The appellate court reviewed the trial court's decision to admit Valle's inculpatory statements under a bifurcated standard of review, according deference to the trial court's findings of fact and reviewing its determination of voluntariness de novo. It found that the trial court's factual determination that Valle lacked any special susceptibility to police tactics was not contrary to the manifest weight of the evidence. In light of this fact, the question before the appellate court was whether "the degree of aggression and deception involved here results in an involuntary confession absent particular susceptibilities of the suspect's." *Id.* at 59, 939 N.E.2d at 20.

The court concluded that Valle's confession was not given involuntarily. Citing *People v. Westmorland*, the appellate court noted that "[u]nder Illinois law a confession may be deemed involuntary in the absence of police misconduct, based entirely on the defendant's personal characteristics." *Id.* at 56, 939 N.E.2d at 18. The court found, however, that where the defendant's personal characteristics do not render him especially susceptible to coercion, Illinois courts require more manipulative police tactics than law enforcement officers used when interrogating Valle. The court also observed that the intimidating and manipulative tactics Valle's interrogators employed to elicit his confession are the very type that some other state courts have held coercive

due to the likelihood that they might induce false confessions. *See id.* at 59–60 , 939 N.E.2d at 21; *Commonwealth v. DiGiambattista*, 442 Mass. 423, 433, 813 N.E.2d 516, 524 (2004); *State v. Rettenberger*, 1999 UT 80 ¶ 20, 984 P.2d 1009, 1015 (1999). Illinois, however, does not currently share these states' "concern with empirical evidence of what police tactics make confessions unreliable." *Valle*, 405 Ill. App. 3d at 61, 939 N.E.2d at 22.

These conclusions are not contrary to clearly established federal law as pronounced by the Supreme Court of the United States. A confession is involuntary when it is given under circumstances sufficient to overbear the defendant's free will. *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963); *see also Johnson v. Pollard*, 559 F.3d 746, 753 (7th Cir. 2009). Courts determine whether a defendant's will has been overborne by looking to the totality of the circumstances surrounding the confession. *Miller v. Fenton*, 474 U.S. 104, 110, 112 (1985); *see also Gilbert v. Merchant*, 488 F.3d 780, 791 (7th Cir. 2007). The question is whether the circumstances surrounding Valle's confession "would have interfered with his free and deliberate choice of whether to confess." *Johnson*, 559 F.3d at 753 (internal citations and quotation marks omitted). The Supreme Court has emphasized that the totality of the circumstances must be considered, but a police officer's false claims that exaggerate the strength of the evidence against the defendant do not render otherwise voluntary confessions involuntary or inadmissible. *See Frazier v. Cupp*, 394 U.S. 731, 739 (1969); *United States v. Montgomery*, 555 F.3d 623, 630 (7th Cir. 2009); *Sotelo v. Ind. State Prison*, 850 F.2d 1244, 1251 (7th Cir. 1988).

Aggressive police tactics like the ones Valle's interrogators employed may indeed

be more likely to lead a defendant to make a false confession. The fact that these aggressive tactics may undermine the reliability of confessions might drive state courts to reevaluate their understanding and application of Supreme Court precedent concerning voluntariness and coercion, reasoning that a defendant's decision to confess falsely might signal that the defendant feels he has no choice but to confess. *See, e.g.*, *DiGiambattista*, 442 Mass. at 439–40, 813 N.E.2d at 527–28. But the Supreme Court has not instructed courts that to determine whether police tactics coerced a defendant into involuntarily confessing, they must consider whether those tactics increase the likelihood that the confession is false. This Court thus cannot say that Illinois courts are subverting, ignoring, or misapplying Supreme Court precedent when they interpret its Fifth Amendment case law as not requiring such an inquiry. The Illinois courts' determination that Valle's confession was voluntary was neither contrary to, nor an unreasonable application of, Supreme Court precedent. Valle is therefore not entitled to relief based on claim two.

## C. Certificate of appealability

When a district court enters a final judgment that dismisses a prisoner's habeas corpus petition, it must issue or deny a certificate of appealability (COA). "[F]ederal courts of appeals lack jurisdiction to rule on the merits of appeals from habeas petitioners" in the absence of a COA. *Miller–El v. Cockrell,* 537 U.S. 322, 336 (2003). To obtain a COA, the petitioner must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A court should issue a COA if it determines that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues

presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel,* 529 U.S. 473, 484 (2000) (internal quotation marks omitted).  When a district court denies a claim on procedural grounds, the petitioner must show both that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

The Court issues a certificate of appealability on Valle's claim that the state courts unreasonably adjudicated his claim regarding the voluntariness of his confession (claim two) but concludes that its rulings on Valle's other claims are not fairly debatable.

## Conclusion

For the foregoing reasons, the Court denies Valle's petition for a writ of habeas corpus [dkt. no. 1] and directs the Clerk to enter judgment in favor of the respondent. The Court issues a certificate of appealability on claim two, Valle's claim regarding the voluntariness of his confession, and declines to issue a certificate of appealability on Valle's other claims.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  June 13, 2016